**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **BRENDA MCKINSEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 13-1270-KHV** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner Of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

Brenda McKinsey appeals the final decision of the Commissioner of Social Security to deny disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. For the reasons set forth below, the Court reverses the judgment of the Commissioner.

**I.    Procedural Background**

On June 18, 2009, plaintiff filed her disability application with the Social Security Administration. See Transcript Of Administrative Record (Doc. #7-2) filed September 12, 2013 ("Tr.") at 125. She alleged a disability onset date of November 16, 1996, and was last insured for benefits on December 31, 1999. Tr. at 18. Plaintiff's benefit application was denied initially and on reconsideration. Tr. at 71-74, 78-85. Plaintiff testified at a hearing on October 27, 2010, and on September 16, 2011, an administrative law judge ("ALJ") concluded that plaintiff was not under a disability as defined in the Social Security Act and that she was not entitled to benefits. Tr. at 13-68. On May 13, 2013, the Appeals Council denied plaintiff's request for review. Tr. at 1-7. The decision of the ALJ stands as the final decision of the Commissioner. See 42 U.S.C. § 405(g). Plaintiff appealed to this Court the final decision of the Commissioner.

## II.   Factual Background

The following is a brief summary of the relevant evidence presented to the ALJ.

### A.   Medical Evidence From Examining And Treating Physicians

In 1994, plaintiff began treatment for depression with Judith M. Bowen, M.D., at the Menninger Clinic.  See Tr. at 879.  Dr. Bowen diagnosed plaintiff with major depression, recurrent, moderate and assessed a GAF of 55.[1]  Tr. at 882.

In August 1994, plaintiff had a comprehensive examination and reported history of back pain, leg pain, irritable bowel, and abdominal and chest pain.  Tr. at 866-70.  In November of 1994, plaintiff's nerve conduction and EMG[2] showed no abnormalities, so P.C. Amaraneni, M.D., at the Menniger Clinic, suggested "further work-up with the possible diagnosis of fibromyalgia to rule out any associated rheumatological or other systemic causes."  Tr. at 856. On December 28, 1994, Robert Thomen, M.D., prescribed medication to relieve leg and back pain and irritable bowel symptoms.  Tr. at 259.

On December 27, 1995, plaintiff went to the emergency room ("ER") at Labette County Medical Center reporting overall pain, vomiting and intermittent rectal bleeding.  Tr. at 750. Doctors diagnosed her with pyelonephritis, hemorrhoids, fibromyalgia and Epstein-Barr virus. Tr. at 752.  Plaintiff received Demerol and Phenergan for pain control.  On December 31, 1995,

---

[1]     The GAF, or Global Assessment of Functioning score, is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning."  Holcomb v. Astrue, 389 F. App'x 757, 759 n.1 (10th Cir. 2010) (quoting Am. Psychiatric Ass'n, Diagnostic And Statistical Manual Of Mental Disorders (4th ed. 2000) at 32).  A GAF of 55 "indicates moderate symptoms, such as occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as conflicts with peers or co-workers."  See id. at 760 n.3 (citing Am. Psychiatric Ass'n, supra, at 34).

[2]     EMG, or electromyography, is "a medical procedure for measuring the electrical impulses of muscles at rest and during contraction."  Cohen v. Estate of Lockwood, No. 02-2246-JPO, 2005 WL 1631091, at *2 (D. Kan. July 11, 2005).

after her condition improved, plaintiff was discharged.  Id.  Plaintiff was directed to follow up in seven to ten days.  Id.

On January 12, 1996, plaintiff saw Dr. Bowen and reported that her mood was not depressed, she was not irritable with her mother and she was sleeping well.  Tr. at 816.  She reported, however, that she was still quite tired and that her energy level was still low due to her physical symptoms.  Id.

Between 1996 and 1999, plaintiff required regular urethral dilation and cystoscopy for urinary tract infections and dysuria.  Tr. at 251-56, 306, 308, 309, 726-28, 734-35.

On March 6, 1996, plaintiff went to the ER at Labette County Medical Center for urinary retention and exacerbation of her fibromyalgia.  Tr. at 743-48.   She was given a catheterization and discharged.  Tr. at 745.

On June 23, 1996, plaintiff was again admitted to the ER at Labette County Medical Center, for a flare-up of fibromyalgia.  Tr. at 740.  The doctor noted two trigger points in her thoracic region and lower back and gave plaintiff injections at these points.   Id.  Plaintiff reported not sleeping well and total body aches.  Id.  Less than a month later, plaintiff was in the ER at Labette County Medical Center for pain in her back and legs.  Tr. at 738.  She reported a migraine headache and fibromyalgia, and she received trigger point injections.  Tr. at 738.

On October 7, 1996, plaintiff went to the Labette County Medical Center ER due to nausea and vomiting.  Tr. at 732.  Doctors discovered moderate fecal retention, but no bowel obstruction or free intra-abdominal air.  Id.

On December 4, 1996, plaintiff saw Ray L. Carlson, D.O., at the Erie Clinic for a check-up.  Tr. at 290.  Dr. Carlson noted that plaintiff was "quite a complex patient."  Tr. at 290. He noted that she felt that her antidepressant medication was not helping and she was feeling

"more down than ever." Id. She also reported having more migraines and taking Imitrex injections and Ibuprofen, which irritated her stomach. Id. The doctor recommended that she not take Ibuprofen, but continue the Imitrex. Id. He diagnosed her with fibromyalgia, dysthymic disorder, chronic fatigue syndrome and migraine headache. Tr. at 289-90. He also changed her depression medication. Tr. at 289.

On January 2, 1997, plaintiff returned to Dr. Carlson. Id. He noted that plaintiff was recovering from a UTI and that she seemed to be doing well and adjusting better, despite her depression. Id. He further noted that plaintiff had flu-like symptoms and was sleeping all the time. Id. Dr. Carlson diagnosed her with fibromyalgia, major depression and flu-like symptoms, and he increased her dosage of Paxil. Tr. at 292. Shortly thereafter, on February 5, 1997, plaintiff reported abdominal pain and a colon attack at the Erie Medical Clinic. Tr. at 291. Her condition was assessed as irritable bowel syndrome ("IBS"), gastritis and possible diverticulitis. Id.

On February 11, 1997, plaintiff again saw Dr. Carlson. Id. Plaintiff reported being very tired, but she seemed "to be doing well" and "very happy." Id. Dr. Carlson noted generalized tenderness in plaintiff's abdomen and diagnosed IBS, adjustment disorder with mixed emotional features, chronic fatigue syndrome and fibromyalgia. Id. Dr. Carlson gave plaintiff a Vitamin B12 injection. Id. Later that month, on February 26, 1997, plaintiff saw Dr. Carlson again. Tr. at 294. Though plaintiff stated that she was not depressed about anything in particular, she did report feeling more tired than she had for several months, that she had no energy, tired easily, was eating more and was "itchy all over." Id. She also reported muscle aches and acid reflux. Id. Dr. Carlson prescribed medication and advised plaintiff also to continue other current medications. Tr. at 293-94. Dr. Carlson noted that if plaintiff did not improve, she would have

to be admitted to the hospital.  Tr. at 294.  Plaintiff returned to Dr. Carlson the next day.  He noted that she was doing well on her medications, and that her fibromyalgia and depression had improved.  Tr. at 293.  He also noted that plaintiff should continue her medications and be monitored closely.  Id.

On March 6, 1997, plaintiff reported a migraine headache and possible allergic rhinitis, and Dr. Carlson gave her a Nubain shot.  Tr. at 296.  Dr. Carlson saw plaintiff again on March 31, 1997.  Tr. at 295.  He noted that she seemed to be doing better and that her energy level was increasing.  Tr. at 295.  He noted that her symptoms were "still pretty severe," however, and that they were very variable from day to day.  Id.  Dr. Carlson diagnosed plaintiff with obesity, fibromyalgia and depression.  Tr. at 298.

On April 5 and June 9, 1997, Dr. Carlson completed forms for the Kansas Farm Bureau Life Insurance Company.  Tr. at 913-14.  He opined that plaintiff was totally disabled due to Epstein Barr and fibromyalgia and that she could not lift, bend or stoop and had difficulty with chronic pain.  Id.

On June 16, 1997, plaintiff saw Dr. Carlson to receive trigger point injections due to severe pain from fibromyalgia.  Tr. at 300.  Dr. Carlson noted 12 tender points on exam.  Id.  Plaintiff reported feeling much better after the injections.  Id.

On July 28, 1997, plaintiff saw Dr. Carlson for a follow-up examination and trigger point injection for fibromyalgia.  Tr. at 302.  About a week later, on August 8, 1997, a doctor at Erie Medical Clinic gave plaintiff a Vitamin B12 injection.  Tr. at 301.  On August 19, 1997, she returned to the ER due to a migraine, and received medications.  Tr. at 724.  She received another Vitamin B12 injection on August 25, 1997 at the Erie Medical Clinic.  Tr. at 301.  On October 15, 1997, plaintiff again saw Dr. Carlson for a checkup.  Tr. at 304.  She reported that

she "was really feeling pretty good" but that her depression was worsening, and her medications were causing hair loss.  Id.  She also reported feeling more achy.  Id.  Dr. Carlson gave plaintiff trigger point injections and changed her depression medication.  Id.  He noted that he would continue to monitor plaintiff.  Id.

On November 10, 1997, plaintiff saw Dr. Carlson and received six trigger point injections.  Tr. at 303.  She reported having nightmares.  Id.  Dr. Carlson diagnosed her with fibromyalgia, chronic depression and anxiety and altered the dosage of her depression medication.  Id.  He also prescribed a medication for back pain, hoping to decrease her need for trigger point injections.  Id.  On December 4, 1997, plaintiff again saw Dr. Carlson for symptoms of a urinary tract infection and muscle spasms from fibromyalgia.  Tr. at 305.  Her urine analysis was normal, but Dr. Carlson ordered a urine culture and started her on Vantin and Flexeril.  Id.  On January 12, 1998, David Mullies, R.P.A.C., a physician assistant in Dr. Carlson's office, filled out another disability insurance form which stated that plaintiff had severe fibromyalgia, that she could not lift, bend or stoop, and that she would be totally disabled for at least 12 months.  Tr. at 912.

On March 31, 1998, plaintiff received trigger point injections in her back and hip from Sonya Culver, D.O. at the Erie Medical Clinic.  Tr. at 308.  On April 9, 1998, plaintiff returned to Dr. Culver for a urinary tract infection and lower abdominal and back pain.  Tr. at 307.  On April 28, 1998, plaintiff saw Dr. Culver again to review her lab work.  Tr. at 310.  Dr. Culver noted pain with range of motion on exam, especially in the back and hips, as well as tender areas due to fibromyalgia.  Id.  Plaintiff received a Vitamin B12 injection and changed depression medications.  Id.

On May 4, 1998, plaintiff returned to Dr. Culver and reported "just not feeling very well."  Id.  Plaintiff reported that she did not know whether it was due to fibromyalgia and reported an upset stomach.  Id.  She reported almost vomiting and having some diarrhea, as well as fluid retention in her legs, ankles and feet.  Id.  Dr. Culver diagnosed plaintiff with fluid retention and gastroenteritis and started her on Ceftin and Lasix.  Tr. at 309.

On May 18, 1998, plaintiff saw Michael L. Peaster, M.D., who prescribed Ciprofloxacin for urinary tract infection.  Tr. at 253.  On May 22, 1998, Dr. Peaster performed a urethral dilation.  Tr. at 252.  On May 29, 1998, plaintiff went to the Labette County Medical Center emergency room for a headache that seemed to be getting progressively worse over the course of few days.  Tr. at 721.  Plaintiff reported nausea and neck pain and spasm.  Id.  The doctor noted tenderness to palpation of trapezius muscles and diagnosed plaintiff with tension cephalgia and muscle spasm of the neck.  Id.  The doctor prescribed Nubain and Phenergan.  Id.  On June 1, 1998, Dr. Culver gave plaintiff another Nubain shot for migraine headache.  Tr. at 312.  Plaintiff told Dr. Culver that she had some migraine headaches over the weekend, but they had gone away.  Id.  Then, on June 17, 1998, Dr. Culver provided trigger point injections for plaintiff and noted that they "seem to work very well for her."  Tr. at 311.

On November 16, 1999, Gene Hahn, M.D., at the Ashley Clinic saw plaintiff for reported fatigue, sore throat and back pain.  Tr. at 245-46.  Dr. Hahn noted that plaintiff was on Nubain and Phenergan for her migraines, as well as Paxil, BuSpar and birth control.  Tr. at 245.  The doctor further noted trigger point tenderness and diffuse pain on palpation.  Id.  Dr. Hahn advised exercise and weight loss for figromyalgia and salt gargle for sore throat.  Tr. at 246.

**B.      Evidence From Non-Examining Physicians**

**1.      Non-Examining Physician David W. Bullock, D.O.**

On October 14, 2009, non-examining physician David W. Bullock, D.O., completed a Physical Residual Functional Capacity Assessment on plaintiff.  Tr. at 570.  Dr. Bullock opined that plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand or walk about six hours in an eight-hour workday with normal breaks; sit about six hours in an eight-hour workday with normal breaks; and push and pull, including operating hand or foot controls for an unlimited period.  Tr. 571.  Dr. Bullock stated that plaintiff had no postural limitations and she could climb ramps, stairs, ladders, ropes and scaffolds; and balance, stoop, kneel, crouch and crawl.  Tr. at 572.  Dr. Bullock said that plaintiff had no manipulative limitations and could reach in all directions, handle, finger and feel.  Tr. at 573.  Dr. Bullock noted that plaintiff should avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases, poor ventilation, etc.  Tr. at 574.  Dr. Bullock stated she had no environmental limitations regarding extreme heat, wetness, humidity, noise, vibration or hazards such as machinery or heights.  Id.

When asked how Dr. Bullock arrived at his findings regarding limitations and symptoms, he referred to his own statement in the "additional comments" section of the form.  He claimed that plaintiff alleged disability since November 16, 1996 due to Epstein-Barr virus, chronic fatigue syndrome, depression and anxiety, fibromyalgia, heart irregularities, IRB and high blood pressure.[3]  See Tr. at 577.  Dr. Bullock stated that plaintiff alleged a viral infection and chronic fatigue syndrome.  He stated that the medical records supported the allegations, but not to the degree that plaintiff alleged.  Id.  Dr. Bullock stated that an exercise stress test on April 7, 2003

---

[3]      It is unclear what "IRB" means.

(years after the date that plaintiff was last insured) showed that plaintiff could exert herself close to the level necessary to perform at a heavy work level. Id. Dr. Bullock stated that her test showed she could "almost perform unlimited amounts of physical exertion," which "certainly removes any doubt about her exercise capacity." Id. He continued that "[a]llowing for intermittent problems with urethral strictures and abdominal complaints, plaintiff is reduced to the exertional level shown in this RFC." Id.

### 2. Non-Examining Medical Expert Harry D. Haas, M.D.

On December 24, 2010, non-examining medical expert Harry D. Haas, M.D., answered interrogatories that the ALJ posed to him. Tr. at 895-910. Asked to state what medical evidence established plaintiff's impairments, Dr. Haas listed, "RFC Medium 9F," "CE: 8-26-09: Chronic fatigue Fibromyalgia" and "20F GAF 55, MOD, F/M 5/2/96." Tr. at 895. "RFC Medium 9F" presumably referred to Dr. Bullock's opinion, which was Exhibit 9F in the record provided to Dr. Haas. Dr. Haas stated that plaintiff's physical symptoms did not support her alleged impairments. Tr. at 896. Dr. Haas specified that on December 24, 2010, the plaintiff's limitations were fatigue, chronic pelvic pain and 210 pound weight with an effective date of October 12, 2010. Tr. at 897 (citing medical records covering November 9, 2004 through October 8, 2010, after the date last insured). Asked about specific functional limitations as of the date of alleged disability onset (November 16, 1996), Dr. Haas wrote, "See RFC." Id. Asked to specify plaintiff's impairments established by the medical evidence prior to the date last insured (December 31, 1999), Dr. Haas wrote, "See RFC." Id. Asked about specific functional limitations as of the date last insured (December 31, 1999), Dr. Haas wrote "chronic fatigue[,] Major depressive disorder."

Dr. Haas also filled out the "Medical Source Statement Of Ability To Do Work-Related Activities (Physical)." See Tr. at 899-904.  He stated that plaintiff could lift up to ten pounds continuously and 11 to 20 pounds frequently, and could carry up to ten pounds frequently and 11 to 20 pounds occasionally.  Tr. at 899.  Asked to identify particular medical or clinical findings which supported his assessment, he simply noted "See Above."  Id.  Dr. Haas then stated that plaintiff could sit for eight hours, stand for six hours, and walk for four hours continuously without interruption or total in an eight-hour workday.  Tr. at 900.  Asked to identify particular medical or clinical findings which supported his assessment, he noted "Medium RFC 9F."  Id.  Dr. Haas stated that plaintiff could continuously reach, handle, finger, feel, push or pull with her left and right hands.  Tr. at 901.  Asked to identify particular medical or clinical findings which supported his assessment, he noted, "See Above."  He stated that plaintiff could continuously operate foot controls.  Id.  He left blank the section which asked him to identify particular medical or clinical findings which supported his assessment.  See id.  Dr. Haas noted that plaintiff could continuously climb stairs and ramps, occasionally climb ladders or scaffolds, and frequently balance, stoop, kneel, crouch or crawl.  Tr. at 902.  Asked to identify particular medical or clinical findings which supported his assessment, he wrote, "See RFC 9F."  Tr. at 902.  Dr. Haas noted that plaintiff could frequently tolerate exposure to unprotected heights, extreme cold and extreme heat, and continuously tolerate exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, pulmonary irritants and vibrations.  Tr. at 903.  Asked to identify particular medical or clinical findings which supported his assessment, he wrote, "RFC 9F."  Id.  Dr. Haas opined that plaintiff could perform activities like shopping; travel without a companion; ambulate without using a wheelchair, walker or two canes or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use

standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle or use paper and files.  Tr. at 904.  Dr. Haas left blank the section which asked him to identify particular medical findings that supported his assessment.  Id.

On March 11, 2011, Dr. Haas answered interrogatories from plaintiff's counsel.  Most of the questions asked whether, in coming to his opinion, Dr. Haas had reviewed specific medical records.  Tr. at 908-10.  Dr. Haas did not answer the questions; rather, he simply initialed them. Plaintiff's counsel also asked the following question:

> In the RFC you assessed, when queried as to "the particular medical or clinical findings . . . which support your assessment or any limitations and why the findings support the assessment," you responded, "Medium RFC 9F."  The RFC assessed by the SSA does not match the criteria of evidence set forth in the question.  Which of the claimant's medical records did you rely on when assessing the claimant's RFC?

Tr. at 910.  Dr. Haas answered as follows:

> Thank you for your thorough review of medical records.  My opinion, listing levels for fibromyalgia, chronic fatigue syndrome [and] migraine head aches [sic] not met under listing 10 multiple body systems [and] listing 14.05 polymyositis, urethral stricture with recurrent urinary tract infection not met 6.02.  I hope this additional evidence aids you in your further evaluation of this client[']s ailments!

Id.

### C.   Plaintiff's Testimony

Plaintiff testified at a hearing on October 27, 2010 before ALJ Michael R. Dayton.  Tr. at 32-68.  Plaintiff testified to limitations in her activities of daily living, including the need for frequent breaks, not leaving home, and not driving because of fatigue.  Tr. at 51-55.  Plaintiff testified that for a time after every meal, she suffered excruciating pain from irritable bowel syndrome.  Tr. at 52-53.  Plaintiff testified that she stopped working due to the pain in her legs, fatigue, stress and memory issues.  Tr. at 55-56.  She said that she was no longer a reliable

employee.  Tr. at 56.  Plaintiff testified to fatigue, problems walking and "fibro-fog" which impacted her memory.  Tr. at 36-37.  She also testified to pain in her legs, shoulders, torso and back, and to getting frequent trigger point injections.  Tr. at 37, 39.  She described problems with her arms, causing her to drop things without warning and said that she had to prop up her arms just to hold her nephew.  Tr. at 42-43.  She testified to sleeping around 12 hours a day, and said that if she over-exerted herself after getting a cortisone shot, she would be in bed the next day. Tr. at 44, 50.  Plaintiff testified that she would have five to six bad days a week due to depression and that she was negative, struggled to get along with people, and had to rely on her mother to manage her money.  Tr. at 45-46.  She also testified to monthly migraines that could last two to four days.  Tr. at 47-49.  Plaintiff stated that by 1999, she was "just going to the chiropractor, if I felt like I needed it, and exercising."  Tr. at 58.

### D.    ALJ Decision

In his order of September 16, 2011, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 1999.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 16, 1996 through her date last insured of December 31, 1999 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments:  chronic fatigue, fibromyalgia, obesity, irritable bowel syndrome (IBS), and a history of migraines (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a range of work that includes the ability to lift 10 pounds continuously and up to 20 pounds frequently and carry 10 pounds frequently

and up to 20 pounds occasionally; stand for six hours at a time and six hours total in an eight-hour workday; walk for up to four hours at a time and four hour[s] total in an eight-hour workday; sit for up to eight hours at one time and up to eight hours total in an eight-hour workday; and only occasionally climb ladders or scaffolds.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April 8, 1962 and was 37 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.159(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 16, 1996, the alleged onset date, through December 31, 1999, the date last insured (20 CFR 404.1520(g)).

## III.    Standard Of Review

The ALJ decision is binding on the Court if substantial evidence supports it.  See 42 U.S.C. § 405(g); Dixon v. Heckler, 811 F.2d 506, 508 (10th Cir. 1987).   The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards.  See Castellano v. Sec'y of HHS, 26 F.3d 1027, 1028 (10th Cir. 1994).  While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Evidence is not substantial "if it is overwhelmed by other

evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion."  Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (citation omitted).

**IV.**   **Analysis**

Plaintiff bears the burden of proving disability under the Social Security Act.  See Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).   The Social Security Act defines "disability" as the inability to engage in any substantial gainful activity for at least 12 months due to a medically determinable impairment.   See 42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work.  See 20 C.F.R. §§ 404.1520, 416.920.  If claimant satisfies steps one, two and three, she will automatically be found disabled; if claimant satisfies steps one and two, but not three, she must satisfy step four.  If step four is satisfied, the burden shifts to the Commissioner to establish that claimant is capable of performing work in the national economy. See Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988).

Here, the ALJ denied benefits at step five.  Plaintiff claims that the ALJ erred at step four because he did not provide a proper RFC by failing to (1) properly weigh the medical opinions; (2) consider plaintiff's depression and migraine headaches; and (3) properly analyze plaintiff's credibility.  The Court agrees that the ALJ failed to properly weigh the medical opinions.

### A.      The ALJ Failed To Properly Weigh The Medical Opinions

The relevant medical opinions for the period before plaintiff's date last insured include Dr. Carlson's treating physician opinion, Dr. Haas' non-examining medical expert opinion and Dr. Bullock's non-examining state agency opinion.[4] Tr. at 570-94, 898-914, 912-14.  Plaintiff argues that the ALJ gave (1) too little weight to the opinion of treating physician Dr. Carlson and (2) too much weight to the opinion of non-examining expert Dr. Haas.  The Commissioner claims that the ALJ properly discounted Dr. Carlson's opinion (as inconsistent with other record evidence) and properly gave significant weight to Dr. Haas' opinion (as it was supported by substantial evidence).

Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of claimant's impairments, including claimant's symptoms, diagnosis and prognosis.   20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  A physician who treats a patient regularly over some period of time is recognized as a treating source with better insight into a patient's medical condition and with an opinion that is generally entitled to "particular weight" or "controlling weight."  Doyal v. Barnhart, 331 F.3d 758, 762-63 (10th Cir. 2003).  Generally, the opinions of non-treating sources receive more weight than opinions of non-examining sources who have merely reviewed medical records.  Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004).

A treating physician's opinion does not carry controlling weight, however, unless it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in the record.  Watkins v. Barnhart, 350 F.3d 1297, 1300

---

[4]      The record also contains an opinion from C.A. Parsons, M.D., non-examining state agency doctor, which affirms Dr. Bullock's opinion.

(10th Cir. 2003); 20 C.F.R. § 404.1527(d)(2); Soc. Sec. Ruling (SSR) 96–2p, 1996 WL 374188, at *2 (July 2, 1996).  The opinion is not entitled to controlling weight if it is brief, conclusory and unsupported by medical evidence.  Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987).

If the ALJ does not give controlling weight to a treating physician opinion, he must give the opinion deference and weigh it using all factors set forth in the regulations.  Watkins, 350 F.3d at 1300 (quoting SSR 96–2p, 1996 WL 374188, at *4).  In particular, the ALJ must consider the following factors: (1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Id. at 1301; 20 C.F.R. §§ 404.1527(d)(2–6), 416.927(d)(2–6); see Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001).  After considering the factors, the ALJ must give reasons for the weight which he gives the treating source opinion.  Watkins, 350 F.3d at 1301.  If the ALJ rejects the opinion completely, he must give specific, legitimate reasons for doing so.  Id.  If the treating physician opinion conflicts with another opinion, the ALJ must examine the other physician's reports to see if they outweigh the treating physician's report, "not the other way around."  Reyes v. Bowen, 845 F.2d 242, 245 (10th Cir. 1988).

###### 1.        Opinion Of Treating Physician Dr. Carlson

Plaintiff asserts that the ALJ did not properly weigh the opinion of plaintiff's treating physician, Dr. Carlson.  Plaintiff's Social Security Brief (Doc. #8) filed October 25, 2013, at 14-17.  As noted above, Dr. Carlson's opinion was that plaintiff was unable to lift, bend or stoop,

and that plaintiff was totally disabled from any occupation for at least 12 months due to Epstein-Barr related fatigue and fibromyalgia.  The ALJ stated that Dr. Carlson's opinion was "shaky" and "not entitled to controlling weight."  He stated that the record provided little support for substantial limitations during this period and that Dr. Carlson's opinion that plaintiff could not lift, bend or stoop was not supported by either the record or plaintiff's own allegations.  Tr. at 23.  The ALJ stated that plaintiff "testified she had some difficulty with lifting, such as needing her arms propped up to support the weight of holding her nephew, but she never alleged a complete inability to lift.  She also never alleged a complete inability to bend or stoop."  Id.  The ALJ further found that Dr. Carlson's opinion that plaintiff was totally disabled and unable to perform any occupation intruded onto matters reserved to the Commissioner under SSR 96-5p and was "well outside Dr. Carlson's area of expertise."  Id.  Therefore the ALJ credited the opinion "very little weight."  Id.

Although the ALJ stated that Dr. Carlson's opinion that plaintiff could not bend or stoop was not supported by the record, he did not point to any part of the record that contradicted it.[5] Plaintiff never testified that she could bend or stoop during the time period between her alleged onset date and the date last insured, and the ALJ never asked her that question.  Plaintiff did testify that she was tired all of the time, that she was in bed during this time for several days at a time after exerting herself and that she needed help from her mother to perform everyday activities.  Tr. at 137, 181-82.  This testimony was consistent with Dr. Carlson's opinion that plaintiff could not lift, bend or stoop due to fibromyalgia.  The ALJ stated that plaintiff testified

---

[5]        Plaintiff did testify that between 1996 and 1999, she did her own laundry, which could support the ALJ's decision to give little weight to Dr. Carlson's opinion.  Tr. at 51-52.  It is not clear whether plaintiff had to lift, stoop or bend while doing laundry, however, and the ALJ did not ask her that question.

that "she had some difficulty with lifting, such as needing her arms propped up to support the weight of holding her nephew, but she never alleged a complete inability to lift."  Tr. at 23. Plaintiff, however, actually testified as follows:

> Well, I would drop stuff, like, in '96, I had a great nephew.  In order to hold him, they would have to take pillows and prop up my arms.  And I would just sit in one place and hold them [sic].  And then someone would sit there with me, of course, in case he started to, you know, move or something, because I just couldn't hold the weight of him.

Tr. at 43.  Plaintiff's testimony does not support the ALJ's conclusion that plaintiff could lift.  To the extent the ALJ thought it material whether plaintiff could lift, bend or stoop during the relevant time period, he should have asked her.  See Romero v. Astrue, No. 08-2584, 2009 WL 3190460, at **8-9 (D. Kan. Sept. 30, 2009) (ALJ's duty of inquiry requires fully and fairly developing material issues).  "An ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*." McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002) (quotation omitted; emphasis in original).  Therefore, the ALJ did not give good reasons for giving Dr. Carlson's opinion little weight.  Remand is warranted.

### 2.    Opinion Of Non-Examining Medical Expert Dr. Haas

Plaintiff also asserts that the ALJ erred by giving "significant weight" to Dr. Haas' opinion.  Plaintiff's Social Security Brief (Doc. #8) at 17-20.  The ALJ stated that his opinion was based on a review of the available medical records and "[o]n that basis, Dr. Haas opined that the claimant has the functional abilities and limitations described in the residual functional capacity."  Tr. at 24.  He stated that the limitations were consistent with plaintiff's fatigue and pain, which credibly limited her exertional abilities.  Id.  The ALJ also stated that plaintiff

"credibly testified that they limited her ability to lift her young nephew, providing further support for a 20-pound limitation."  Id.

Plaintiff argues that the ALJ erred in giving significant weight to Dr. Haas' opinion because (1) no written report or persuasive evidence accompanied it, and it therefore does not constitute substantial evidence upon which to base an RFC, and (2) the ALJ improperly gave it more weight than Dr. Carlson's opinion.  Plaintiff's Social Security Reply Brief (Doc. #16) at 3; Plaintiff's Social Security Brief (Doc. #8) at 17-20.  Plaintiff argues that while Dr. Haas had access to the entire record, "he failed to support his limitations with any written report or persuasive evidence."  Plaintiff's Social Security Brief (Doc. #8) at 18.  Specifically, plaintiff states that on the "Medical Source Statement Of Ability To Do Work-Related Activities (Physical)," Dr. Haas checked boxes indicating plaintiff's abilities, but when asked to identify particular medical or clinical findings to support the RFC findings, Dr. Haas only cited to Dr. Bullock's opinion – which the ALJ discounted.[6]  Id. at 18-19.  The Commissioner argues that the "ALJ reasonably evaluated the medical opinions and gave good reasons for the weight given to each opinion," and that because "a reasonable mind could credit the evidence that the ALJ relied on in evaluating the opinions, the decision is supported by substantial evidence in the

---

[6]      The ALJ gave "little weight" to Dr. Bullock's opinion that plaintiff was limited to a range of medium work.  Tr. at 24.  The ALJ stated that "the limitation to medium work does not appear to adequately accommodate the claimant's complaints of pain and fatigue, which suggest greater exertional limitations."  Id.  The ALJ also noted that Dr. Bullock's opinions that plaintiff have limited exposure to cold and pulmonary irritants were unsupported by the record and plaintiff's testimony.  Id.  Dr. Bullock's RFC, which purported to identify plaintiff's RFC between the alleged onset date and date last insured, relies heavily on an exercise stress test performed after the date plaintiff was last insured.  Tr. at 577.  Dr. Bullock's opinion does not contain any other opinions or findings.  The Court agrees that Dr. Bullock's opinion was entitled to little weight.

record as a whole and should be affirmed." Brief Of The Commissioner (Doc. #13) at 16. The Court agrees, however, that Dr. Haas' opinion is not supported by substantial evidence.

Dr. Haas relied almost exclusively on Dr. Bullock's RFC, which the ALJ correctly afforded "little weight." See Tr. at 24. Dr. Haas' opinion is not supported by persuasive evidence and the ALJ's reasons for granting it significant weight are not legitimate. In response to every question which asked him to identify medical evidence upon which he based his limitations, Dr. Haas either (1) stated "See Above" (without identifying what he was referring to), (2) identified Dr. Bullock's RFC, or (3) entirely failed to answer the question. It appears that Dr. Haas provided further limitations within his RFC: for example, he stated that plaintiff could lift up to ten pounds continuously and 11 to 20 pounds frequently and carry up to ten pounds frequently and 11 to 20 pounds occasionally, as opposed to Dr. Bullock's opinion that plaintiff could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds. Dr. Haas, however, did not cite any medical evidence in support of his determination of plaintiff's limitations during the relevant time period. Furthermore, Dr. Haas did not identify any medical evidence in response to interrogatories which he answered on March 11, 2011. Because the ALJ's reasons for giving significant weight to Dr. Haas' opinion are not legitimate, remand is warranted. See Reyes, 845 F.2d at 245 (examining or non-examining physician's report and opinion should be examined to see if it outweighs treating physician's report, "not the other way around").

Because the Court must remand the decision for proper consideration of the medical opinions, the Court does not reach plaintiff's arguments regarding the combined effects of her impairments, including her depression and migraine headaches, or whether the ALJ improperly weighed plaintiff's credibility.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) **REVERSING** the Commissioner's decision and **REMANDING** for further proceedings in accordance with this memorandum and order.

Dated this 10th day of July, 2015, at Kansas City, Kansas.

s/ Kathryn H. Vratil<br>
KATHRYN H. VRATIL<br>
United States District Judge